1  **MITCHELL MILLER**
2  501 Herondo Street, #24
   Hermosa Beach, CA 90254
3  Tel: (310)387-6390
4  Fax: (909) 899-3881
   Email: mitchellrmiller@gmail.com
5
6  PLAINTIFF IN PRO PER



7              **UNITED STATES DISTRICT COURT**
8              **CENTRAL DISTRICT OF CALIFORNIA**
9

10  MITCHELL MILLER                    CASE NO. CV-16-07528 RGK(GJSx)

11          Plaintiff,                 COMPLAINT FOR:

12  v.

13  BANK OF AMERICA, N.A. AS           1. Fraud
    SUCCESSOR IN INTEREST TO           2. Breach of the Implied Covenant of
14  AMERICA'S WHOLESALE LENDER            Good Faith & Fair Dealing
15  ITS SUCCESSORS AND/OR ASSIGNS;     3. Void and/or Cancel Ab Initio Deeds
    THE BANK OF NEW YORK MELLON           of Trust & Promissory Notes
16  FKA THE BANK OF NEW YORK AS        4. Cancellation of a Voidable Contract
17  TRUSTEE FOR THE ALTERNATIVE           Under California Revenue & Tax
    LOAN TRUST 2005-86CB, AND             Code §§ 23304.1, 23305a, et seq.
18  BAYVIEW LOAN SERVICING, LLC;       5. Violation of California Corporations
19  and DOES 1-10, Inclusive,             Code § 191(C)(7)
                                       6. Breach of Fiduciary Duty
20          Defendants.                7. Violation of California Business &
21                                        Professions Code § 17200, et seq.
                                       8. Violation of California HBOR Civil
22                                        Code §§ 2924(a)(6), 2924.17
                                       9. Wrongful Foreclosure
23                                     10. Declaratory Relief 28 U.S.C. §§
24                                        2201, 2202
                                       11. Quiet Title Relating to Violations of
25                                        The Federal Truth in Lending Act
26                                        ("TILA"), 15 U.S.C. §§ 1635,
                                          1641(g)
27
28

1

COMPLAINT

Plaintiff, MITCHELL MILLER, ("Plaintiff" or "MILLER"), for his Complaint against Defendants BANK OF AMERICA, N.A. AS SUCCESSOR IN INTEREST TO AMERICA'S WHOLESALE LENDER ITS SUCCESSORS AND/OR ASSIGNS,  in its capacity as purported successor to the original lender, America's Wholesale Lender, hereinafter referred to as AWL, THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE ALTERNATIVE LOAN TRUST 2005-86CB, in its capacity as the alleged beneficiary of the debt obligation, and BAYVIEW LOAN SERVICING, LLC, in its capacity as purported loan servicer, "collectively" Defendants, pleads and alleges as follows:

## STATEMENT OF JURISDICTION

This Court has proper subject matter Jurisdiction over the within action as the real property, the subject of instant action, is so situated and physically located within this California Central District Judicial system.

This Court has original jurisdiction over the claims in this action based on *28 U.S.C. §§ 1331, 1332, 1343, 2201, 2202, 15 U.S.C. § 1635,* and *42 U.S.C. § 1983* which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law.[1]

This Court has original jurisdiction over the claims in the action based on *28 U.S.C. § 1332* which confers original jurisdiction on federal district courts in suits between diverse citizens that involve an amount in controversy in excess of $75,000.00.

This Court also has supplemental jurisdiction over the pendant state law claims because

---

[1] The Ninth Circuit instructs that in actions brought under *28 U.S.C. § 2201*, district courts must first determine whether there is actual controversy within its jurisdiction by analyzing the factors enumerated in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942).  The *Brillhart* factors require the Court to 1) avoid needless determination of state law issues; 2) discourage litigants from filing declaratory actions as a means of forum shopping; and 3) avoid duplicative litigation.  *Brillhart*, 316 U.S. at 495; *see also Schafer v. Citimortgage* No. CV 11-0319, 2011 WL 2437267 (C.D. Cal. June 15, 2011).  As held by the court in *Schafer*, this action does not involve a needless determination of state law issues, does not involve forum shopping, and is not duplicative litigation.

2

COMPLAINT

they form a party of the same case or controversy under Article III of the United States Constitution, pursuant to *28 U.S.C. § 1367*.

The unlawful conduct, illegal practices, and acts complained of and alleged in this Complaint were all committed in the Central District of California and involved real property located in the Central District of California.  Therefore, venue properly lies in this District, pursuant to *28 U.S.C. § 1391(b)*.

## SUBJECT REAL PROPERTY AT ISSUE

The Real Property (herein after referred to as "Property"), the subject of any and all claims of any of the Parties hereto, and which is the subject of instant action, and that of which Plaintiff prays for a Decree and/or Order for Declaratory Relief thereto.  The "Subject Property" address and legal description is as follows:  11812 S. Main Street, #1, 2, 3, 4, Los Angeles, CA 90061. More particularly, the legal description of this property is:

Lot 35 of Tract No. 3287, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 36, Page 3 of Maps, in the Office of the County Recorder of said County.

Assessor's Parcel Number:  6083-018-002

## IDENTITY OF PARTIES

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, BANK OF AMERICA, NATIONAL ASSOCIATION AS SUCCESSOR IN INTEREST TO AMERICA'S WHOLESALE LENDER, herein referred to as BOFA, is a national banking and mortgage lending institution licensed to do business in the State of California, in and of the County and City where subject "PROPERTY" is so situated and physically located which is within this Courts Judicial District.

COMPLAINT

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE ALTERNATIVE LOAN TRUST 2005-86CB, herein referred to as BNYM, is a national banking institution licensed to do business in the State of California, in and of the County and City where subject "PROPERTY" is so situated and physically located which is within this Courts Judicial District.

Plaintiff is informed and believes, and thereon alleges, that at all times relevant hereto Defendant, BAYVIEW LOAN SERVICING, LLC herein referred to as BAYVIEW, is a mortgage institution licensed to do business in the State of California, in and of the County and City where subject "PROPERTY" is so situated and physically located which is within this Courts Judicial District.

Plaintiff is unaware of the true names and capacities of any individuals and/or entities sued herein under the fictitious names DOES 1 to 10, inclusive or, to the extent that the names of such individuals or entities may become known to Plaintiff, and as such Plaintiff cannot state with any certainty that such a Cause of Action lies herein as against such individuals or entities, or Plaintiff is unable to alleged the elements of such Cause of Action, at this time, and as such said Defendant are herein named in accordance with the provisions of (*Cal Code of Civil Procedure Sec. 474*). Plaintiff thereon reserves the right to amend instant Complaint to allege the true names and capacities of such fictitiously named Defendant when the same become known or when it has been ascertained with reasonable certainty that such Cause of Action hereunder can be satisfactorily stated and maintained as against each such fictitiously named individual or entity.

Plaintiff is informed and believes and thereon alleges, that in committing certain acts

4

COMPLAINT

alleged, some or all of the Defendants named were acting as the Agents, Joint Ventures, Partners, Representatives, Subsidiaries, Affiliates, Associates, Successors, Assigns and/or Employees and/or Agents or some or all of the other Defendants, and that some or all of the conduct of such Defendants, as complained of herein, was within the course and scope and agency of such relationship.

Wherever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each Defendant acted individually and jointly with the other Defendants.

Any allegation about acts of any corporate or other business Defendant means that the corporation or other business did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

At all relevant times, each Defendant committed the acts, caused or directed to others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Additionally, some or all of the Defendants acted as the agent of the other Defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of the other.

At all relevant times, Defendant knew or realized that the other Defendants (successors and/or assigns) were engaging in or planned to engage in the violations of law alleged in this Complaint.  Knowing or realizing that the other Defendant were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

At all times mentioned in this Complaint, Plaintiff, MITCHELL MILLER, is an individual consumer residing in the County of Los Angeles and is the owner of the certain Subject Property.

## GENERAL ALLEGATIONS AND FACTS COMMON TO ALL CAUSES OF ACTION AND TO ALL NAMED DEFENDANTS AND DOE DEFENDANTS

### I.   MATERIAL FACTS

On December 9, 2005, Plaintiff MILLER executed two Deeds of Trust in favor of America's Wholesale Lender, hereinafter referred to as AWL.

On December 20, 2005, AWL caused to be recorded with the Los Angeles County Recorder's Office the Deeds of Trust, hereinafter referred to as DOT, and Promissory Note, hereinafter referred to as Note, recorded as Instrument Numbers 05 3129929 and 05 3129930 respectively.  Attached as **Exhibit "A"** and incorporated herein by reference is a copy of the first DOT.  Attached as **Exhibit "B"** and incorporated herein by reference is a copy of the second DOT.

The DOTs shows that on December 8, 2005 when the DOTs were created, Plaintiff was fraudulently induced to endorse the DOTs and Notes to a non-existent and unregistered company, AMERICA'S WHOLESALE LENDER ("AWL").

Plaintiff MILLER, a citizen of California, made payments in good faith based upon the misrepresented terms of the DOTs and Notes.

Recent discoveries show that AWL was never a registered entity.  AWL was never registered in the State of California, nor were they registered in the State of New York as stated in the DOTs.  AWL was never a corporation that was organized and existing under the laws of New York.  Attached as **Exhibit "C"** and incorporated herein by reference is a Certificate from the State of New York, Department of State evidencing that AWL was never registered with the State of New York. Countrywide may have trademarked the name but they never incorporated AWL as a LLC or a corporation.

6

COMPLAINT

Plaintiff MILLER's Deed of Trust on Page 1 (C) states:

"Lender" is AMERICA'S WHOLESALE LENDER.  Lender is a Corporation
    organized and existing under the laws of NEW YORK."

It is clear that the above statement is a lie, a false statement based upon the Certificate of

Incorporation from the State of New York, Department of State.

AWL was a DBA of Countrywide Financial's Countrywide Home Loans, Inc., hereinafter

referred to as Countrywide. Countrywide began using "America's Wholesale Lender", which

was never registered with the State of California, in the early years of the housing boom to

determine which loans were originated on the wholesale market and which loans were originated

by various Countrywide offices throughout the U.S. with MERS (Mortgage Electronic

Registration Systems) named as the nominee for AWL.  Attached as **Exhibit "D"** and

incorporated herein by reference is a Certificate of No Record from the California Secretary of

State.

This created a huge liability for MERS and the people and law firms MERS authorized to

sign for MERS on mortgage assignments because MERS is only allowed to act as nominee for

its members and only assign mortgagee rights for its members.  MERS had to know AWL was

NOT and NEVER was a MERS member and that AWL was NOT and NEVER was a New York

corporation as stated on Plaintiff's DOTs.

On July 1, 2008, Bank of America Corporation completed its purchase of Countrywide

Financial Corporation which included Countrywide Bank, N.A and AWL.  Due to this

acquisition, Defendant BOFA allegedly became successor in interest to Countrywide and AWL.

As such, Plaintiff MILLER thereby seeks an order of the Court that voids and/or cancels

AB INITIO the DOTs and Notes, and quieting title to Plaintiff MITCHELL MILLER, alone,

based upon what has been stated above and below.

### A.    Failed Securitization Attempt

During the Mortgage Boom Era of 2002 to 2007, Wall Street investors looked to feed their insatiable and reckless greed for profit by tapping directly into the American Dream – home ownership.  Mortgage lenders and investment banks aggressively lured the American people into predatory loans with teaser interest rates and into purchasing homes with inflated appraisals under the promise that the booming real estate market would continue to boom.  Wall Street took the soon to be toxic loans and bundled them into "Mortgage Backed Securities" through a process known as "Securitization."  These "securities" were then sold to investors in the form of certificates, whereby the investors became the "Certificateholders" of the securities that were to be fed by the toxic loans.

Knowing that the predatory loans would soon default and turn into toxic assets, Wall Street placed their bets accordingly and bought exotic insurance products in the form of Credit Default Swaps.[2]  Thus, when the Mortgage Boom turned into a Mortgage Meltdown (which it did), they would stand to make even more profit when the mortgage insurance paid them out of their "losses."

---

[2] In 1995, JPMorgan Chase created the Credit Default Swap (CDS).  Essentially, a CDS is a form of insurance intended to protect the buyer of the policy in case of a loan default.  If the loan defaults, the buyer of the CDS receives a large payout for the cash value of the defaulted loan.  The main difference between a traditional insurance policy and a CDS is that anyone can purchase a CDS, even those who have no direct "insurable interest" in the lender.  CDSs were instrumental during the housing bubble because once the banks ran out of creditworthy borrowers, they had to turn to uncreditworthy "subprime" borrowers, and to avoid losses from default, they moved these risky mortgages off their books by bundling them into "securities" and selling them to investors.  To induce investors to buy these securities, the securities were then "insured" with credit default swaps.  CDSs allowed investors to bet against the average American to default on their mortgage with little risk.  CDS insurance was especially attractive to investors who had knowledge of the subprime mortgage industry since they knew the likelihood of default on those loans was much higher.  Notably, AIG Insurance Company ("AIG"), an insurance carrier who owned a considerable market share of these CDS policies, was unable to make good on these policies after the housing bubble burst resulting in AIG seeking a government bailout.  See Justin Fox, *Why the Government Wouldn't Let AIG Fail?*.  TIME Business (September 16, 2008)

However, in their rush to "securitize" the predatory loans, Wall Street failed to actually follow its own rules and regulations, creating the instant situation where the securities are not actually backed by any mortgages at all.  Under the standard model, the promissory notes were *supposed* to be sold and transferred into a trust pool ("Securitized Trust") that holds the promissory notes as collateral on the securities bought by investors ("Certificateholders").  These "true sales" allow the original lenders to move the notes off their books, eliminating the need to maintain capital- adequacy reserves against default.  The purpose of securitizing collateral debt obligations was to provide a large supply of money to lenders for originating loans, and to provide investment to bond holders – which were expected to be relatively safe.

The Securitized Trusts, if ever formed properly, are subject to and governed by (1) the Pooling and Servicing Agreement, hereinafter referred to as PSA; (2) The Mortgage and Loan Agreement; (3) the 424B5 Prospectus; (4) the common law trust rules of Delaware or New York, depending on its origin; and (5) Internal Revenue Code section 860A through 860G, better known as the Real Estate Mortgage Investment Conduit ("REMIC") rules.

An essential aspect of the mortgage securitization process is that the Trust must obtain and maintain good title to the mortgage loans comprising the pool for that certificate offering.  This is necessary in order for the Trustee of the purportedly Securitized Trust to be legally entitled to enforce the mortgage loans in case of default.  In addition to other required documentation to complete the Collateral File of any given loan, two documents relating to each mortgage loan must be validly transferred to the Trust as part of the securitization process – the Promissory Note and the Deed of Trust.  In this case, on information and belief, neither document was validly transferred.

---

http://www.time.com/time/business/article/0,8599,1841699,00.html.  Thus, in the end, it was the American taxpayer who bore the burden of these CDSs.

COMPLAINT

Here, Plaintiff alleges that the "true sales" never took place due to the failure of the original lender to follow the basic legal requirements for the transfer of a negotiable instrument. Plaintiff further alleges that, on information and belief, Defendant BOFA, as Successor to the original lender AWL, attempted to sell his debt obligation to the Alternative Loan Trust 2005-86CB, hereinafter referred to as 2005-86CB Trust. Plaintiff alleges that this 2005-86CB Trust, that purportedly owns Plaintiff's Notes and DOTs, have been dissolved due to the disbursement and receipt of mortgage insurance payouts to The Bank of New York, the Trustee of the 2005-86CB Trust, and the Certificateholders (including, but not limited to, Credit Default Swaps and other exotic mortgage insurance products). As a result of these mortgage insurance payouts, BNYM and the original lender, AWL, have been paid in full on Plaintiff's debt obligation, despite the fact that there was never a contract between AWL and Plaintiff.

Plaintiff's information and belief is based on (1) analysis of the Property's county records; (2) research, experience, extensive review of depositions, case law, amicus briefs, correspondence, news articles, reports, and publicly available securitization documents and practices; (3) filings with the Securities and Exchange Commission ("SEC").

Plaintiff alleges and believe thereon that on or around the time of origination of Plaintiff's loan, AWL attempted to securitize and sell Plaintiff's loans to another entity or entities. **That entity was *not* the 2005-86CB Trust or The Bank of New York Mellon.**

After researching his recorded chain of title, Plaintiff alleges on information and belief that AWL never sold, transferred, or granted Plaintiff's Notes and DOTs to the Sponsor, Depositor, the 2005-86CBTrust.[3] Furthermore, Plaintiff alleges that Defendant BOFA, as Successor to the

---

[3] The Sponsor in a securitization transaction is a specialty finance company engaged in the business of originating, purchasing and selling retail and wholesale sub-prime mortgage loans secured by one-to-four-family residences. Here, the Sponsor is Countrywide Home Loans, Inc. The Depositor is the entity that assembles the underlying

COMPLAINT

original lender AWL, cannot demonstrate that Plaintiff's Notes and DOTs were ever properly endorsed and transferred to BNYM, as Trustee of the 2005-86CB Trust.

The parties involved in the alleged Securitization and transfer of Plaintiff's Notes and DOTs failed to strictly adhere to the PSA, which requires that Plaintiff's Notes and DOTs be properly endorsed, transferred, accepted, and deposited with the 2005-86CB Trust (or its custodian) on or about December 28, 2005, the "closing date" indicated on the Prospectus, or 90 days thereafter.  The "closing date" is the date by which all of the Notes and DOTs must be transferred into the 2005-86CB Trust.  Attached as **Exhibit "E"** and incorporated herein by reference is a copy of the 2005-86CB Trust FWB Prospectus, pages 1-6, obtained from www.secinfo.com.  The failure to do so results in the Notes and DOTs not being part of the 2005-86CB Trust res.

The failure to deposit and transfer the Notes into the 2005-86CB Trust before the closing date is a violation of the PSA and of New York trust law. *Yvanova v. New Century Mortgage Corp.*, (2016) 62 Cal.4th 929; *Glaski v. Bank of America, N.A.* (2013) 218 Cal.App.4th 1079. Plaintiff does not allege that he is the beneficiary of the PSA.  Rather, Plaintiff alleges that the failure to securitized his Notes and DOTs makes it impossible for Defendant BNYM as trustee of the 2005-86CB Trust, to claim, allege or assert that it was assigned, transferred or granted Plaintiff's Notes and DOTs, or any interest therein, in any manner whatsoever.  Plaintiff also alleges that the failure to securitize his Notes and DOTs has resulted in an unperfected lien that Defendants cannot enforce in a manner whatsoever.

---

collateral, helps structure the securities, and works with the financial markets to sell the securities to investors.  Here the Depositor is CWALT, Inc.  In order to securitize a mortgage loan and preserve the chain of title, the PSA requires that 'true sales' take place between the Sponsor and Depositor, and that each entity properly endorse and deliver the promissory note, and other mortgage loan documents, to the subsequent party until the loan is assigned to the Securitized Trust.

COMPLAINT

In accordance with the precise terms and REMIC provisions of the PSA (i.e., required "true sale" of each mortgage loan), securitization Sponsor/Seller and Depositor **were each paid in full** for selling Plaintiff's mortgage loan in the verified securitization transaction. However, a review of the chain of title of the mortgage property in the official records of the Los Angeles County Recorder does not show any valid assignment(s) of the DOTs from original lender AWL, to all of the aforementioned entities, on or about December 28, 2005, the Closing date of the REMIC MBS Trust, or 90 days thereafter.

Therefore, there is no record of the required intervening assignments of the DOTs from original lender AWL, to Sponsor/Seller to Depositor to the Issuing Entity, to the Trustee of the 2005-86CB Trust, within the time frame allowed under the PSA. This was a material breach of the binding and governing terms of the trust agreement, which resulted to an irreversible break in the chain of title of the property and ownership of Plaintiffs' mortgage loan – with the present beneficiary, mortgagee and successor lender <u>unassigned</u>, <u>undocumented</u> and <u>UNKNOWN</u> to date.

On November 8, 2010, an Assignment of Deed of Trust was executed and subsequently recorded on November 15, 2010 which allegedly assigned all beneficial interest in the DOT to BNYM. A copy of the Assignment of Deed of Trust is attached hereto as **Exhibit "F"** and incorporated herein by reference. Based on the aforementioned, the Assignment of Deed of Trust is void on its face and is a complete nullity. Plaintiff adamantly disputes the contents of the Assignment of Deed of Trust.

**B.    Material Facts Leading to Plaintiff's Right to Rescind**

On May 20, 2009, as part of The Helping Families Save Their Homes Act of 2009, *Section 404(a)* of the 2009 Act amended TILA to establish a new requirement for notifying consumers of

the sale or transfer or their mortgage loans.  The purchaser or assignee that acquires the loan must provide the required disclosures no later than 30 days after the date on which it acquired the loan.  This provision is contained in TILA Section *131(g)*, *15 U.S.C. 1641(g)* and it applies to *any* consumer credit transaction secured by the dwelling of a consumer.  Mortgage loans sold, or otherwise transferred on or after that date became subject to the requirements of *Section 131(g)* and failure to comply can result in civil liability under TILA *Section 130(a).  See 15 U.S.C. 1640(a).*

The TILA amendment seeks to ensure that consumers attempting to exercise the right to rescind know the identity of the assignee and how to contact the assignee or its agent for that purpose.

Assignee liability is an important issue in rescission.  *Section 131* specifically exempts rescission from this rule so a borrower could compel the assignee of a loan with violations **triggering the right of rescission to rescind the loan,** even though the violations are not apparent on the face of the disclosure statement.

*Section 131* of TILA states as follows:

(g) NOTICE  TO NEW CREDITOR-

(1)  IN GENERAL – In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including-

(A) the identify, address, telephone number of the new creditor;

(B) the date of transfer;

(C) how to reach an agent or party having authority to act on behalf of the new creditor;

//

COMPLAINT

     (D) the location of the place where transfer of ownership of the
         debt is recorded; and

     (E) any other relevant information regarding the new creditor.

Plaintiff alleges that he never received a *404 Notice* informing him of BYNM's beneficial ownership in his debt obligation.  Although the DOT and Assignment of Deed of Trust is void on its face, Plaintiff's right to rescind was extended under TILA.  Plaintiff exercised his right under TILA.  On September 14, 2014, pursuant to *15 U.S.C. § 1635*, Plaintiff rescinded the Transaction by mailing a Notice of Rescission to his alleged servicer, Defendant BAYVIEW.  A copy of the Notice of Rescission and the record of mailing from the United States Postal Service is attached hereto as **Exhibit "G"** and incorporated by reference.  BAYVIEW received the Notice of Rescission on September 16, 2016.  BAYVIEW acknowledged receipt of Plaintiff's Notice of Rescission in a letter dated September 22, 2016.  Attached as **Exhibit "H"** and incorporated herein by reference is the September 22, 2016 letter from Defendant BAYVIEW.  No lawsuit was filed against Plaintiff within the 20 days as mandated under TILA.

TILA, *15 U.S.C. § 1635*, *Reg. Z §226.23* allows for a party to rescind the Note and DOT by operation of law.  More than twenty (20) days have elapsed without a declaratory action being filed against Plaintiff by his creditor.  Plaintiff's creditor has failed to challenge Plaintiff's Notice to Rescind.

The Office Staff Commentary, clearly indicates notice to an agent can suffice as notice to the principal and according to the Consumer Financial Protection Bureau and the Dodd-Frank Act, a Notice to Rescind may be mailed to the mortgage servicer.  Rescission rights are equally enforceable against **original creditors and assignees**. *Mattek v. Deutsche Bank Nat. Trust Co.*, 766 F.Supp.2d 899, 902 E.D. Wis. 2011; *Hubbard v. Ameriquest Mortgage Co.,* No. 05 CV 389,

COMPLAINT

2008 WL 4449888 (N.D. Ill. Sept. 30, 2008).  Both TILA and its implementing regulation only require rescission notification to the "creditor". *15 U.S.C. § 1635(a)*; *12 C.F.R. § 226.23(a)(2)*. Under TILA, a creditor refers to the person to whom the debt arising from the transaction is initially payable on the face of the evidence of indebtedness, original lender America's Wholesale Lender. *15 U.S.C. § 1602(f)*.  As noted by the Official Staff Commentary, the creditor's interest in the property is **"automatically negated regardless of its status and whether or not it was recorded or perfected"**.  (*Official Staff Commentary §§ 226.15(d)(1)-1, 226.23(d)(1)-1*).

Since Plaintiff's creditors have failed to challenge Plaintiff's Notice to Rescind within the twenty (20) statutory days mandated under TILA, Defendants BOFA, as Successor to AWL, and any other entity, cannot obtain any right or interest to enforce a contract that was made void after September 14, 2016.

To date, Defendants and/or the actual alleged "creditor", have failed and refused, and continues to fail and refuse, to perform any of the acts required by *15 U.S.C.§ 1635(b)*. Congress enacted TILA to be self-enforcing.  The statute and regulation specify that the Security Interest (Deed of Trust) and Promissory Note arising by operation of law on the property becomes automatically void upon mailing of a Notice to rescind. (*15 U.S.C. § 1635(b)*; *Reg. Z §§ 226.15(d)(1), 226.23(d)(1)*.  Specific violations do not necessarily have to be alleged with particularity (*Brown v. Mortgagestar*, 194 F.Supp.2d 473 (S.D.W.Va. 2002) **(notice pleading is all that is required in TILA case)**.  Pro Se need not specify specific statute or regulations that entitle him to relief; court will examine complaint for relief on any possible legal theory).

Justice Scalia and a unanimous Supreme Court affirmed in *Jesinoski v. Countrywide*, 574 U.S.__(2015), the clear import of *15 U.S.C. §1635(a)* is that a borrower need only provide

written notice to a lender in order to exercise his right to rescind. **The statute makes no distinction between the right to rescind in 3-days or extended as neither case nor statute give courts equitable discretion to alter TILA's substantive provisions.** It is effective by operation of law upon mailing. It is held immune from courts' equitable modification authority.

The statutory scheme created by Congress in TILA requires strict compliance by creditors when it comes to rescission. **TILA rests squarely on procedure rather than substance. If a creditor acquiesces or fails to challenge a borrower's rescission within 20-days of a notice of rescission, the rescission is complete.** Any defenses after the statutory 20-day period not only strays outside the four-corners of the Complaint, but it strays outside the strict statutory requirements of TILA.

The courts have construed TILA as a remedial statue, interpreting it liberally for consumer. *Riggs v. Government Employees Financial Corp.*, 623 F.2d 68, 70-71 (9th Cir. 1980). As the Sixth Circuit noted, "[o]nly if Congress clearly manifests its intent to limit the federal court's jurisdiction will it be precluded from addressing allegations of fraudulent concealment which by their very nature, if true, serve to make compliance with the limitation period imposed by Congress an impossibility."

## II.   PLAINTIFF HAS STANDING TO CHALLENGE AN ASSIGNMENT AS VOID

The loan was originally made to AWL and was allegedly sold and transferred to the 2005-86CB Trust. There is no record of Assignments to either the Sponsor or Depositor as required by the Pooling and Servicing Agreement.

In *Carpenter v. Logan*, 16 Wall. 271, 83 U.S. 271, 274, 21 L.ed. 313 (1872), the U.S. Supreme Court stated:

//

16

COMPLAINT

> *"The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."*

An obligation can exist without or without security. With no security, the obligation is unsecured but still valid. A security interest, however, cannot exist without an underlying existing obligation. It is impossible to define security apart from its relationship to the promise or obligation it secures. The obligation and the security are commonly drafted as separate documents – typically a Promissory Note and a DOT. If the creditor transfers the Note but not the DOT, the transferee receives a secured Note; the security follows the Note, legally if not physically. If the transferee is given the DOT without the Note accompanying it, the transferee has no meaningful rights except the possibility of legal action to compel the transferor to transfer the Note as well, if such was the agreement. *Kelley v. Upshaw* (1952) 39 C.2d 179, 246 P.2d 23; *Polhemus v. Trainer* (1866) 30C 685.

> *"Where the mortgagee was "transferred" only the mortgage, the transaction is a nullity and his "assignee" having received no interest in the underlying debt or obligation, has a worthless piece of paper (4 Richard R. Powell), Powell on Real Property, § 37.27 [2] (2000).*

By statute, assignment of the Note carries with it the assignment of the debt. In the event that a mortgage somehow separates interests of the Notes and the DOTs, with the DOTs lying with some independent entity, the mortgage becomes unenforceable. The practical effect of splitting the DOTs from the Notes is to make it impossible for the holder of the Note to enforce the DOTs, unless the holder of the DOTs is the agent of the holder of the Notes. Without the agency relationship, the person holding only the trust will never experience default because only the holder of the Note is entitled to payment of the underlying obligation. The mortgage loan becomes ineffectual when the Note holder did not also hold the DOT, as in the case at bar.

COMPLAINT

Pursuant to State statutory law, if the DOTs and the Notes are not together with the same entity, there can be no legal enforcement of the Notes.  Thus, if the DOTs and the Notes are separated, enforcement of the DOTs cannot legally occur.  The Notes cannot be enforced by the DOTs if each contains a different mortgagee/beneficiary; and, if the DOTs are not itself a legally enforceable instrument as in the case at bar.

There is no evidence on Record to indicate that the DOTs was ever transferred concurrently with the purported legal transfer of the Notes, such that the DOT and Note have been irrevocably separated, thus making a nullity out of the purported security in a property as claimed.  (Federal Rules of Evidence, Rules 901 & 902)

A void contract is without legal effect.  "It binds no one and is a mere nullity." (*Little v. CFS Service Corp.* (1987) 188 Cal.App.3d 1354, 1362.) "Such a contract has no existence whatsoever.  It has no legal entity for any purpose and neither action or inaction of a party to it can validate it…" *Colby v. Title Ins. And Trust Co.* (1911) 160 Cal. 632, 644.)

Unlike a voidable transaction, a void one cannot be ratified or validated by the parties to it even if they so desire.  *Colby v. Title Ins. and Trust Co., supra,* 160 Cal. at p. 644; *Arnoff v. Albanese, supra,* 446 N.Y.S.2d at p. 370.)  Parties to a securitization or other transfer may well wish to ratify the transfer agreement despite any defects, but no ratification is possible if the assignment is void *ab initio*.  In seeking a finding that an assignment agreement was void, therefore, a plaintiff in Plaintiff MILLER's position is not asserting the interests of parties to the assignment; they are asserting their own interest in limiting action on their property to those with legal authority.  This, then, is not a situation in which standing to sue is lacking because its "sole object…is to settle rights of third persons who are not parties." *Golden Gate Bridge etc. Dist. V. Felt* (1931) 214 Cal. 308, 316.)

18

COMPLAINT

Plaintiff is not challenging the securitization of his loan, Plaintiff reference the securitization documents only to show that none of the Defendants to this lawsuit have no standing to enforce his mortgage loan and are entitled to payments. Plaintiff has every right to protect his property rights and due process rights guaranteed by California's Constitution.

## III.   PLAINTIFF HAS NO OBLIGATION TO PAY AN ENTITY OTHER THAN THE ENTITY ENTITLED TO PAYMENT

With respect to "negotiable instruments," California's *Commercial Code § 3301* specifies as follows:

> "Person entitled to enforce" an instrument means (a) the
> holder of the instrument, (b) a nonholder in possession of
> the instrument who has the rights of a holder, or (c) a person
> not in possession of the instrument who is entitled to enforce
> the instrument pursuant to *Section 3309* or subdivision (d) of
> *Section 3418*. A person may be a person entitled to enforce
> the instrument even though the person is not the owner of the
> instrument or is in wrongful possession of the instrument.

According to this code section, which applies to "negotiable instruments," the instrument may only be enforced by someone who possesses the original instrument, unless they meet the exceptions that are set forth in *Commercial Code § 3309* or *§ 3418(d)*. In the case at bar, on information and belief, no entity or Defendant BOFA or any of its successors and/or assigns are actual holders in due course of Plaintiff's Note such that they could enforce Plaintiff's debt obligation and demand mortgage payments.

On information and belief, Defendant BOFA its successors and/or assigns, if any, are not a non-holder in possession of Plaintiff's Note who have rights of the holder.

If there was a holder in due course of Plaintiff's Note at issue, pursuant to *Commercial Code § 3301, et seq.* and/or the pooling and servicing agreement, it is the entity that can establish a pecuniary, legal, and equitable interest in the Property, and provide an unbroken chain of title

19

COMPLAINT

to Plaintiff's Notes and DOTs.[4]

On information and belief Defendant BOFA, as Successor to AWL, its successors and/or assigns is not entitled to enforce Plaintiff's Note pursuant to *Commercial Code § 3309* or subdivision (d) of *§ 3418*. No entity, including Defendant BOFA and its successors and/or assignees have a secured or unsecured legal, equitable, or pecuniary interest in Plaintiff's Notes and DOTs as required under California law – irrespective of who is actually in physical possession of Plaintiff's Note.

*Commercial Code § 3301* helps to determine whether or not there had been a "breach" of the Note secured by the DOT that would have entitled an entity to payment. If a lender has perfected its security interest by possessing the original Note or falling within one of the two statutory exceptions then they have the right to receive the mortgage payments. On the other hand, if an entity seeking to collect mortgage payments is not authorized to payment due to lack of compliance with *Commercial Code § 3301*, that entity cannot properly claim that there has been a "breach" that triggers the right to payment. If the Court were to reach any other result, it would create a conflict of laws and would put borrowers in irreparable harm and would deny them their right to due process.

---

[4] The testimony of Linda DeMartini, a 10-year litigation manager for Countrywide, in *In Re Kemp*, Case No. 08-18700-JHW, (Bankr. D.N.J. November 16, 2010) (for publication) exposed the shoddy handling of mortgage notes and deeds of trust of securitized mortgages required to perfect "holder in due course" status. In that case Linda DeMartini described how Countrywide failed to adhere to the most rudimentary of securitization procedures, such as transferring the original promissory note to the trusts that had purchased the loans, as required under the pooling and servicing agreement. Ms. DeMartini testified that it was standard practice for Countrywide to warehouse the original mortgage notes, which were stored in Simi Valley, California, despite securitization contracts that required the notes to be physically transferred to sponsors, trustees or custodians of the securitized trusts. The findings in court decisions all over the country, news stories, attorneys generals' complaints, and state and federal investigations reveal that business practices like Countrywide's were common place and, like Countrywide, most lenders failed to properly comply with protocols required to properly securitize mortgage loans. Ms. DeMartini's testimony has been corroborated by Abigail Field of CNN, who reviewed foreclosures filed in two New York counties between 2006 and 2010 in which Bank of New York was foreclosing on behalf of a Countrywide securitization trusts, and found that none of the 104 loans that were examined were endorsed by Countrywide: "..If the lack of endorsement on these notes is typical – and 104 out of 104 suggests it is – the problem occurs across Countrywide securities." *See* Abigail Field, *At Bank of America, More Incomplete Mortgage Docs Raise More Questions*. Fort., (June 3, 2011), http://finance.fortune.cnn.com/2011/06/03/at-bank-of/america-moreincomplete-mortgage-docs-and-more-questions/.

It is not correct that a borrower has no cognizable interest in the identity of the party enforcing his or her debt.  Though the borrower is entitled to object to an assignment of the Promissory Note, he or she is obligated to the debt, or suffer loss of the security, only to a person or entity that has actually been assigned the debt.  *See Cockerell v. Title Ins. & Trust Co., supra*, 42 Cal.2d at p. 292 [party claiming under an assignment must prove fact of assignment].)  **The borrower owes money not to the world at large but to a particular person or institution**, and only the person or institution entitled to payment may enforce the debt.  *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919.

## IV.  NOT TENDER IS REQUIRED

Tender of the full outstanding debt is not required.  Several courts have recognized a general equitable exception to applying the tender rule where "it would be inequitable to do so." *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997) (internal citations and quotations omitted).

It has been established that tender is not required when the action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Lona v. Citibank, N.A.*, 202 Cal. App.4th 89, 112-13 (2011) (identifying four exceptions to the tender rule); *Sacchi v. Mortgage Electronic Registration Systems, Inc.* (C.D. Cal., June 24, 2011, CV 11-1658 AHM CWX) 2011 WL 2533029, at *9-10 (citing *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148 Cal.App. 2d 558, 564 (1957); *see also Vogan v. Wells Fargo Bank, N.A.*, No. 2:11-CV-02098-JAM-KJN, 2011 WL 5826016, *7-8 (E.D. Cal. Nov. 17, 2011) (The Court holds that the tender requirement does not apply to this case because Plaintiffs are challenging the beneficial interest held by U.S. Bank in the deed of trust, not the procedural sufficiency of the foreclosure itself."); *Foulkrod v. Wells Fargo Financial California Inc.*, No. CV 11-732-GHK (AJWx) (C.D. Cal. May 31, 2011) ("...requiring plaintiff to tender the amount

due on his loan at this time would be illogical and inequitable give that he disputes that Wells Fargo has any rights under the loan.")

Furthermore, pursuant to TILA, after Plaintiff's Notice to Rescind was received by Defendants they had two options to take within the statutory twenty (20) day calendar period. It could have begun the unwinding process by returning the down payment or earnest money and taking action to "reflect the termination of [the] security interest," pursuant to *15 U.S.C. § 1635(b)*. Those actions would, in turn, have triggered Plaintiff's obligation to tender a payoff of the remaining amount. *See Lippner v. Deutsche Bank Nat'l Trust Co.*, 544 F. Supp. 2d at 702 ("The issue of whether [the borrower] can satisfy her rescission obligations [does] not arise until [the lender] ha[s] completed [its] obligations pursuant to TILA.") In the alternative, Plaintiff's creditors, could have filed a declaratory lawsuit against Plaintiff to dispute Plaintiff's right to rescind the loan. Defendants never did and the time for them to act has expired. Under TILA, after the statutory twenty (20) days are completed, the rescission is no longer subject to attack and its effective upon the date it was mailed.

## V.  PLAINTIFF HAS SUFFERED AND CONTINUE TO SUFFER SIGNIFICANT LEGAL AND EQUITABLE DAMAGE

The conduct described above by Defendants are malicious because they knew that they were not acting on behalf of the current pecuniary beneficiary of the Notes and DOTs. However, despite such knowledge, said Defendants continued to demand and collect Plaintiff's mortgage payments.

As a direct and proximate result of the actions of the Defendants set forth above, the title to Plaintiff's home has been slandered, clouded, and its salability has been rendered unmarketable.

22

COMPLAINT

The conduct of Defendants has caused Plaintiff to suffer pecuniary damages.  The pecuniary damages include, but are not limited to, the costs over calculation and overpayment of interest, the costs of repairing Plaintiff's credit, the costs associated with the removing of the cloud from his title, and attorneys' fee, if any, in an amount to be proven at trial.

## FIRST CAUSE OF ACTION – FRAUD
### [Against All Defendants]

1. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

2. Defendant BOFA, as Successor in Interest to AWL and Defendants BNYM and BAYVIEW misrepresented material facts within the loan process used in the DOT and also misrepresented material facts within the Notes when it had claimed to have legal authority to conduct residential loans.

3. Defendants concealed facts known that was relevant to the illegal/unauthorized business practices, namely that AWL, at no point during the times alleged herein, has ever been duly legally authorized by the States of New York and California to engage in residential lending.

4. Defendants unlawfully and without legal authorization entered into a contract, the DOTs, at a time when AWL was not lawfully registered and/or active, in violation of California Laws.

5. Defendants knew, or at least should have known that by manufacturing the DOTs and Notes, and having an illegal, invalid, unregistered business in the State of California, and upon recording it with the Los Angeles County Recorder's Office, all persons viewing it would rely on its alleged truthfulness at the detriment of Plaintiff.

COMPLAINT

6. Defendants did in fact owe Plaintiff an absolute fiduciary duty to disclose all matters which might be relevant to the legality of the documentation being recorded against Plaintiff's Property, namely that their own corporation, AWL, had NO rights to conduct business in the State of California and was not legally authorized to conduct business in the State of California and is still not legally and/or lawfully authorized to engage in lending practices in the State of California.

7. Defendants, having superior knowledge and skills, knew that Plaintiff would not immediately become aware of the facts hidden and not disclosed, and that Plaintiff would not be able to readily discover the material facts associated with the illegal/unauthorized fraudulent actions associated with the DOTs and Notes, namely that AWL at all times mentioned herein, was never duly authorized by the State of California to engage in business practices that violate California Corporate, Revenue & Tax and Financial laws.

8. Defendants all knew that by the recordation of the illegal/unauthorized fraudulent DOTs and Notes, these wrongful and illegal acts of AWL became a violation of both California law and a violation of federal law.

9. Defendants knowingly acted with a total disregard for the truth of the material facts stated within the recorded DOTs, and that Plaintiff and others would have to rely on the misleading, illegal, unlawful statement of conveyance of AWL and Doe Defendants in responding to such recorded instruments, namely Instrument Numbers 05 3129929 and 05 3129930.

10. Defendants all knew that their actions of allowing the illegally created and unauthorized DOTs to be recorded with the Los Angeles County Recorder's Office would immediately cause Plaintiff to suffer financial injury and damages.  If Defendant and not

willfully, illegally and intentionally authorized fraudulent actions regarding the certification of the DOTs, Plaintiff would not have been made to suffer any of the resulting injuries, harm and damages.

11. Defendants all knew that their representation of the misrepresented facts would flow into the damages and injuries to Plaintiff, and Defendants knew that Plaintiff MILLER would in fact have to rely on the misrepresentations presented, and in fact, recorded in the Los Angeles County Recorder's Office of the fraudulently and falsified DOTs, and without their illegal, unlawful, and unauthorized acts and actions of the fraudulent conveyance by AWL, and the resulting reliance thereupon by anyone who came to rely upon what is shown within the DOTs would in fact cause Plaintiff to have had to suffer damages and injuries by AWL's own illegal/unauthorized actions.

12. Defendants engaged in conspiratorial misrepresentations in the acts associated with any type of fraudulent conveyance of the DOTs, with the clear knowledge or, and with the approval of AWL, and that such would not only flow into the damages and injuries of Plaintiff, but would be the predominately decisive and substantial factor in influencing the conduct of Plaintiff MILLER and each person, including the Los Angeles County Recorder's Office, who, among others, would come to rely upon the DOTs in regards to the wrongful, illegal, unauthorized use of the recordation process used by AWL to wrongfully, illegally, and without authorization, invoke the power contained within the DOTs upon the subject property.

13. In this instant matter, Defendants knew, or should have known that AWL should have not engaged in conduct (making residential mortgage loans) without having the proper license. AWL failed to disclose to Plaintiff MILLER that AWL was not the true creditor and was not licensed, registered or authorized to make loans/and/or conduct business in California.

14. Clearly AWL engaged in predatory lending, in particular, AWL violated California *Financial Code § 4973* by their complete failure to provide Plaintiff the necessary required consumer cautions regarding, at the very minimum, the simple fact that AWL was a non-existent entity and not licensed to conduct any type of residential loan business in the State of California.

15. Plaintiff MILLER would not have entered into a contract that was:

    a) with a company that was not duly licensed to conduct business in the State of California; and

    b) which included fraudulent statements to induce Plaintiff to act; and

    c) done with the intent to defraud Plaintiff out of the subject property.

16. The illegal and unauthorized acts and actions of AWL and Defendants involves the intentional, willful, conscious disregard to the wrongful despicable conduct of failing to stop doing business long after having full knowledge that AWL was not registered with the State of New York as a New York Corporation or the California Secretary of State as a foreign entity to do business in the State of California, and for entering a contract with Plaintiff MILLER.

## SECOND CAUSE OF ACTION – BREACH OF THE IMPLIED CONVENANT OF GOOD FAITH AND FAIR DEALING
### [Against All Defendants]

17. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

18. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of food faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to

accomplish its purpose.  California *Civil Code Section 1550*:

19.  Pursuant to *Section 1550*, it is essential to the existence of a contract that there should be the following:

1. Parties capable of contracting;

2. Their consent;

3. A lawful object; and,

4. A sufficient cause or consideration.

California *Civil Code § 1640 s*tates that when, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.

*California Civil Code § 1575* states undue influence consists of the following:

1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;

2. In taking an unfair advantage of another's weakness of mind; or,

3. In taking a grossly oppressive and unfair advantage of another's necessities or Distress.

California *Civil Code § 1558* states it is essential to the validity of a contract, not only that the parties should exist but that it should be possible to identify them.  *Jackson v. Grant* (9th Cir. 1989) 890 F.2d 118, 121.

This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

20.  Alternatively, if the Notes and DOTs was not legally valid and improperly authorized, then AWL, Defendants, and all associated with the DOTs and Notes did not act in good faith and

COMPLAINT

did not deal fairly with Plaintiff MILLER in connection with the Notes and DOTs when it was fraudulent, illegal, and unauthorized publication of the DOTs, the Defendants relied upon to perpetuate this fraud upon the Plaintiff and other "unsuspecting" California residents and taxpayers.

21.  AWL and Defendants enjoyed substantial discretionary power affecting the rights of Plaintiff MILLER during the events alleged in this Complaint.  They were required to exercise such power in good faith.

22.  Defendants engaged in such conduct without standing or the authority to drive Plaintiff's Property into a foreclosure setting so that they could acquire Plaintiff's Property at a bargain basement price.  These actions were a bad faith of the contract between Plaintiff MILLER and AWL and Defendants, which proves that they had no intention of performing the terms and conditions within the contract, existing inside the original Notes and DOTs, in good faith.

23.  Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiff MILLER when the DOTs were created and listing AWL, a non-existent New York entity, as Lender.  AWL without a valid California's Lender license, allowed the execution of the DOTs and Notes on Plaintiff' Property.

24.  As a result of the actions as stated above and below, Defendants breached this covenant, and Plaintiff MILLER has suffered general and special damages in the amount to be determined at trial.

### THIRD CAUSE OF ACTION – VOID AND/OR CANCEL AB INITIO THE DEEDS OF TRUST AND PROMISSORY NOTES
[Against All Defendants]

25.  Plaintiff hereby incorporates by reference each and every one of the preceding

paragraphs as if the same were fully set forth herein.

26. BOFA, as Successor in Interest to AWL, and Defendants engaged in acts of Fraud in the Execution of the DOTs and Notes, when AWL created a contract (the DOT) while not being duly authorized and/or duly licensed to not only conduct business in the State of California.

27. Plaintiff MILLER alleges and contends that the DOTs and Notes, if it is to be relied upon for any reason related to this litigation, is void for fraud in the execution. "When a plaintiff alleges fraud in the execution…(and) a contract fraudulently induced is voidable; but a contract fraudulently executed is void, because there never was an agreement. *See Brown v. Wells Fargo Bank, N.A.* (2008) 168 Cal.App.4[th] 938, 958.

28. The DOTs and Notes were recorded with the Los Angeles County Recorder's Office on December 20, 2005 as Instrument No 05 3129929 and 05 3129930.

29. Plaintiff MILLER acknowledges that reasonable reliance is a necessary element in fraud in the execution…that is, the Plaintiff's failure to discover the true nature of the fraud in regards to AWL not existing or being unlicensed and the predatory loan was without negligence on the Plaintiff's part, and AWL, et al., failure to exercise its fiduciary duty may constitute constructive fraud as well the fraudulent acts mentioned above and below.

### FOURTH CAUSE OF ACTION – CANCELLATION OF A VOIDABLE CONTRACT UNDER REVENUE & TAX CODE §§ 23304.1, 23305a et. seq.
[Against Bank of America]

30. Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

31. Based upon information and belief, Defendant BOFA, as Successor in Interest to AWL, was operating in the State of California, as a non-existent, unlicensed corporation that had no rights to conduct any type of residential mortgage lending business in the State of California,

and without registering as a foreign corporation to avoid paying taxes to the state.

32.   As a result of Defendant's failure to comply with the California franchise tax laws, the DOT alleged herein is voidable by Plaintiff pursuant to Rev. & Tax Code §§ 23304.1, 23304.1(b), and 23305a.

33.   Moreover, AWL, a non-existent New York corporation, was in the business of creating evidences, and it was an unincorporated foreign corporation that had no rights to conduct business in the State of California, that originates loans, and never had any true legal and/or legitimate interest in the subject loan or DOT and Note and thereby does not meet any legal exceptions to the registration requirement for corporations doing business in the State of California, acting as a residential mortgage lender.

34.   Defendant BOFA, as Successor in Interest to AWL, conducted business in California when its status as a corporation was non-existent and not registered with the Secretary of State. Specifically, it prepared and/or executed Plaintiff's DOTs and Notes on the subject property on December 20, 2005.

35.   At all times relevant herein, Defendant BOFA, as Successor in Interest to AWL, was not registered in California and could not prepare or execute the DOTs and/or Notes.

36.   AWL had no legal authority to take such actions.  DOTs are contractual in nature.  A contract made by either a non-existent/unregistered corporation doing business in California and/or corporation that has failed to perform its franchise tax obligations is voidable at the option of any party to the contract, other than the delinquent taxpayer, and Plaintiff MILLER is, in fact, a party to the contract and seeks to thereby void, ab initio, the contract, i.e., the DOTs and the Notes.

37.   Thus AWL did not have the legal capacity to enter into a contract with Plaintiff

COMPLAINT

MILLER or anyone else, and Plaintiff MILLER has the option of voiding the contracts.

Therefore, any action that AWL takes and/or took with regard to assigning the within DOTs and

Notes would be ultra vires and void.

38.  Plaintiff MILLER thereby expressly request an adjudication of the effect that the

DOTs and the Notes, issued and/or recorded by AWL are void ab initio for all purposes.

**FIFTH CAUSE OF ACTION – VIOLATION OF CALIFORNIA CORPORATIONS CODE § 191(C)(7)**
[Against Bank of America]

39.  Plaintiff hereby incorporates by reference each and every one of the preceding

paragraphs as if the same were fully set forth herein.

40.  Defendant BOFA, as Successor in Interest to AWL, was a non-existent foreign

corporation that was transacting business in the State of California, which had failed to qualify

and cannot maintain an action, except upon the satisfaction of certain conditions pursuant to

California *Corporations Code § 2203(c)*.

41.  Plaintiff MILLER first has the burden of proving that AWL was a non-existent and

unauthorized business in California and Plaintiff MILLER believes he has met that burden on

this court.

42.  Once Plaintiff MILLER establishes the bar of the statute then the non-

existent/unregistered foreign corporation (AWL) must comply with *Section 2203(c)*.

43.  *Section 2203(c)* is clear and unambiguous on its face.  *Section 2203(c)* is literally and

unambiguously inapplicable to actions commenced after compliance with Section 2105(c).

*O'Connel God Mines, Ltd v. Baker,* 63 App.2d at p. 389.

44.  The statute, *Section 2203(c)* is to be narrowly construed to effect its remedial purpose.

*American Etc. Wireless v. Superior Court*, 153 Cal. at p. 536.

31

COMPLAINT

45.   The purpose of the Certificate of Qualification is to facilitate service of process and to protect against state tax evasion.  *Neogard Corp. v. Malott & Peterson-Grundy* (1980) 106 Cal. App.3d 213, 219 [164 Cal.Rptr.813].  The qualification statute assures responsible and fair dealing by corporations and equalizes the regulation of foreign and domestic corporations.  (Id. at p. 223)

46.   The qualification statute also serves the purpose of preventing tax evasion by corporations, but it is not primarily a taxation measure.  *Revenue and Taxation Code § 23301* is a taxation measure and precludes a corporation, which has failed to pay its taxes from bringing or defending an action.

## SIXTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY
[Against All Defendants]

47.   Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

48.   Defendants knew, understood and recognized the risks created by their actions of illegally, unlawfully and without authorization, signing, notarizing and witnessing the DOTs and Notes.

49.   Defendant BOFA, as Successor in Interest to AWL, and Defendants BNYM and BAYVIEW owed Plaintiff MILLER a duty not to make use of their non-existent, invalid, unauthorized Corporate business license to commit financial fraud against Plaintiff MILLER.

50.   Defendant BOFA breached that duty by engaging in such practices, and conspired with Defendants BNYM and BAYVIEW in such a way as to behave in a manner that any reasonable person, company, corporation and/or its employees would not have behaved under the same or similar circumstances.

COMPLAINT

51.  And that by engaging in acts to an agreement to conspire to commit Financial Fraud against Plaintiff MILLER, and fraudulently engage in business practices without lawfully existing, without lawfully and duly issued corporate business license by the State of California or New York instead of the usual/lawful way (of documenting/obtaining/showing license authority) show that AWL knew and was aware of their deliberate illegal and unauthorized wrongful acts with the resulting consequences and the resulting damages and harm to the Plaintiff that would cause damages and harm to Plaintiff and make Plaintiff suffer therefrom based on the actions of Defendants.

52.  The Defendants and AWL knew that by committing financial fraud while being unlicensed within the State of California, as duly and necessarily required to convey real property in the State of California, is illegal, unauthorized and not an acceptable way to convey real property in California, yet AWL chose rather to take the chance of breaking the law (California *Penal Code Sections 115* and *115.5*), with the full knowledge and forethought that AWL was not lawfully or legally authorized to do so by the State of California or Federal law.

53.  Defendants knew they were violating California law while engaging in residential lending practices while being non-existent and unlicensed, and that to enter into a fraudulent contract with someone like Plaintiff MILLER would result in Financial Fraud when AWL caused to be recorded with the Los Angeles County Recorder's Office Instruments 05 3129929 and 05 3129930, and knew further that Plaintiff's property rights were being violated by AWL especially what type of loss and damages that could and did occur and continues to happen to the Plaintiff, based on the actions of Defendants and AWL of converting the real property of Plaintiff MILLER for their own personal use and gain.

//

33

COMPLAINT